**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CANDACE LEE FOX,

        Petitioner,

        v.

DEBORAH K. JOHNSON, Warden,

        Respondent.

NO. CV 04-6933 AG (FMO)

**ORDER ACCEPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE**

**INTRODUCTION**

On August 13, 2004, Candace Lee Fox ("petitioner"), a California state prisoner then proceeding pro se, filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition"), pursuant to 28 U.S.C. § 2254. On August 12, 2005, respondent filed a Return to the Petition ("Return"). On November 2, 2005, petitioner filed a Memorandum of Points and Authorities in Support of Traverse/Reply to the Return ("Reply"). On January 25, 2006, petitioner filed an Addendum to Petitioner's Points and Authorities in Support of Traverse ("Supp. Reply").

On October 2, 2009, the assigned United States Magistrate Judge issued a Report and Recommendation recommending that the Petition be granted as to Ground Five, and appointed the Federal Public Defender to represent petitioner in connection with all future proceedings. On October 29, 2009, respondent filed Objections to the Report and Recommendation ("Objections").

1 | On September 15, 2010, petitioner filed a Response to the Objections, and respondent filed a
2 | Reply to the Response on September 30, 2010.

3 | On March 27, 2012, the Magistrate Judge withdrew the previous Report and
4 | Recommendation and issued an Amended Report and Recommendation. On July 5, 2012,
5 | petitioner filed Objections to the Amended Report and Recommendation ("Petitioner's
6 | Objections").

7 | ### DISCUSSION

8 | For the first time in her Objections, petitioner contends that former habeas counsel Richard
9 | Dangler's deficient representation constitutes cause for her procedural default.[1] (See Petitioner's
10 | Objections at 2-4); see also Maples v. Thomas, 132 S.Ct. 912, 924 (2012) ("[A] client cannot be
11 | charged with the acts or omissions of an attorney who has abandoned him. Nor can a client be
12 | faulted for failing to act on his own behalf when he lacks reason to believe his attorneys of record,
13 | in fact, are not representing him."). Assuming arguendo that petitioner has established cause,
14 | petitioner has not attempted to demonstrate prejudice as to Claims Four and Seven. (See
15 | Petitioner's Objections at 1-25). Therefore, as set forth in the Amended Report and
16 | Recommendation, Grounds Four and Seven are procedurally barred, and the Court will not
17 | consider them.

18 | Since petitioner argues prejudice as to Grounds One, Two and Six, (see Petitioner's
19 | Objections at 8-11 & 15-19), the Court will address those claims on the merits.[2] See Franklin v.
20 | Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[C]ourts are empowered to, and in some cases
21 | should, reach the merits of habeas petitions if they are, on their face and without regard to any
22 | facts that could be developed below, clearly not meritorious despite an asserted procedural bar.");

23 |

24 | [1] Although petitioner raises this argument for the first time in Petitioner's Objections, and even
25 | though petitioner is represented by counsel, the Court will exercise its discretion and address the
26 | argument.

27 | [2] Since the California Supreme Court did not address the merits of Grounds One, Two or Six,
28 | the Court reviews those claims de novo, rather than under the AEDPA's more deferential
standard. Cone v. Bell, 556 U.S. 449, 472, 129 S.Ct. 1769, 1784 (2009); Tanner v. McDaniel, 493
F.3d 1135, 1139 (9th Cir.), cert. denied, 552 U.S. 1068 (2007).

1 | Barrett v. Acevedo, 169 F.3d 1155, 1162 (8th Cir.) (en banc), cert. denied, 528 U.S. 846 (1999)
2 | ("Although the procedural bar issue should ordinarily be resolved first, judicial economy
3 | sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while
4 | the procedural bar issues are complicated.").

5 | I.     JUROR MISCONDUCT.

6 |       In Ground One, petitioner contends she was denied an impartial jury and due process of
7 | law due to juror misconduct. (Petition at 5).

8 |       A.     Relevant Background.

9 |       At the beginning of the second day of trial proceedings, defense counsel stated that he had
10 | been "informed by some members of [petitioner's] family that they overheard someone in the
11 | elevator discussing this case with a couple of other people" and "in between them and these three
12 | other people was one of the jurors. A description of the juror fits [Juror] Hogan." (Reporter's
13 | Transcript ("RT") at 277-78). Defense counsel indicated that the conversation involved "a fairly
14 | complete discussion of background" including that petitioner had "been in custody for seven years
15 | and [her] plea [had] been set aside." (Id. at 277). Defense counsel was unaware of who made
16 | the statements. (Id. at 277-78).

17 |       The trial court stated that, "[n]ow that you bring it up we have to do something about it, so
18 | we can bring out [Juror] Hogan and ask him if he's heard anything about the case yesterday in
19 | the elevator." (RT at 278). Another of petitioner's attorneys then stated, "we believe it was [Juror]
20 | Hogan based upon the description[,]" and the trial judge then stated, "I'll ask everybody but I
21 | suppose if you are picking on one potential person then we could bring that person out specifically
22 | and then get whatever information we can. And then after that of course I'll ask the jurors." (Id.).
23 |       Juror Hogan was then called into the courtroom, and the trial court asked him:

24 |              Do you recall yesterday at any time in the hallway or in the elevator
25 |              hearing anything about the [petitioner] particularly or this case? Was there
26 |              any conversation that you can recall regarding [that]?

27 | (RT at 278). Juror Hogan responded, "[i]n the hallway?" (Id. at 279). The trial court replied, "in
28 | the hallway or elevator leaving the building perhaps?" (Id.). Juror Hogan responded, "[n]o." (Id.).

3

1  The trial court then called the remainder of the jurors back into the courtroom. (See id. at 281-82).
2  The trial court stated as follows:

3              One thing I just want to remind the jurors if at any time in the hallway
4              or the elevator or out in the parking lot you overhear people talking about
5              what you think is this case or anything that might resemble it, let me know
6              right away and walk away from those people because what happens it
7              causes all kinds of problems as I talked about earlier and I don't want to have
8              those kind of problems if we can avoid it. Not that it's going to happen but
9              if it's even close walk away and let my bailiff know the next day that this
10             happened so we can just inquire of the jurors.

11 (Id.). The trial court then asked "the jurors and the alternates as well, [did] anybody overhear any
12 kind of conversations in the hallway or elevator yesterday or any other day? If so just raise your
13 hand. Okay. Nobody? Okay." (Id. at 282).

14        Additionally, following a lunch break in the trial on January 9, 1992, petitioner's attorney
15 informed the court outside the jury's presence that

16             one of the family members had indicated to [defense counsel]
17             that when we took our lunch break they were out in the hall and there
18             were two gentlemen, apparently court watchers – a gentleman in a
19             maroon jacket – and in a loud voice said something to the effect that
20             the victim in this case was a very mean man or a very nasty man.
21             Something to that effect. And there were a number of jurors in their
22             immediate presence. Everybody was waiting out by the elevator.

23 (RT at 859). The trial court responded that it would "bring out the jurors and once again ask them
24 if [they] have heard anything in the hallway." (Id.). When the jury returned, the trial court then
25 asked them:

26             I need to ask all the jurors once again if anybody during the
27             lunch break or in the hallway heard anything about the case from
28             anybody like spectators that were talking about the case or anything.

4

1    [¶]   Anybody hear anything about anybody or anything about the
2    case?  Okay nobody.  All right.

3  (Id. at 860).

4    B.    Applicable Federal Law.

5        "The right to an impartial jury is guaranteed by both the Sixth Amendment,[3] made
6  applicable to the States through the Fourteenth Amendment, and by principles of due process."
7  Turner v. Murray, 476 U.S. 28, 36 n. 9, 106 S.Ct. 1683, 1688 n. 9 (1986) (footnote added). "In
8  essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of
9  impartial, 'indifferent' jurors.  The failure to accord an accused a fair hearing violates even the
10  minimal standards of due process." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642 (1961);
11  see Morgan v. Illinois, 504 U.S. 719, 727, 112 S.Ct. 2222, 2228 (1992); Smith v. Phillips, 455 U.S.
12  209, 217, 102 S.Ct. 940, 946 (1982) ("Due process means a jury capable and willing to decide
13  the case solely on the evidence before it[.]"); Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct.
14  1507, 1522 (1966) ("Due process requires that the accused receive a trial by an impartial jury free
15  from outside influences."). "The bias or prejudice of even a single juror would violate [the] right
16  to a fair trial." Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir.) (en banc), cert. denied, 525 U.S.
17  1033 (1998); Estrada v. Scribner, 512 F.3d 1227, 1239-40 (9th Cir.), cert. denied, 554 U.S. 925
18  (2008).

19        "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very
20  least that the evidence developed against a defendant shall come from the witness stand in a
21  public courtroom where there is full judicial protection of the defendant's right of confrontation, of
22  cross-examination, and of counsel." Turner v. Louisiana, 379 U.S. 466, 472-73, 85 S.Ct. 546, 550
23  (1965) (internal quotation marks omitted); Grotemeyer v. Hickman, 393 F.3d 871, 877 (9th Cir.
24  2004), cert. denied, 546 U.S. 880 (2005). Thus, a defendant "is entitled to a jury that reaches a

25

26

27        [3]  The Sixth Amendment of the United States Constitution requires that in "all criminal
28  prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury[.]"
     U.S. Const., Amend. VI.

5

1   verdict on the basis of evidence produced at trial, exclusive of 'extrinsic evidence.'"[4] Grotemeyer,
2   393 F.3d at 877; see Bayramoglu v. Estelle, 806 F.2d 880, 887 (9th Cir. 1986); Tong Xiong v.
3   Felker, 681 F.3d 1067, 1075 (9th Cir. 2012), pet. for cert. filed, (Nov. 24, 2012) ("Extraneous
4   influences on a jury can, under some circumstances, require the reversal of a conviction."). A
5   petitioner is entitled to habeas relief, however, only if she can establish that the exposure to
6   extrinsic evidence had a "'substantial and injurious effect or influence in determining the jury's
7   verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714 (1993) (quoting
8   Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)); Sassounian v. Roe,
9   230 F.3d 1097, 1108 (9th Cir. 2000).

10   C.   Analysis.

11   The issue raised before the trial court was whether one of the jurors had been exposed to
12   extrinsic material related to petitioner's case, potentially raising a question about the juror's
13   continued impartiality. (See RT at 277-79 & 281-82). Here, the trial court conducted a hearing
14   on the matter and explored and resolved the relevant issues. (See id. at 277-82). At the hearing,
15   the trial court first spoke with Juror Hogan, the juror whom defense counsel speculated may have
16   been the juror who overheard the alleged elevator conversation the previous day. (See id. at
17   279). Juror Hogan stated that he had not overheard any conversation regarding petitioner or
18   petitioner's case in the hallway or the elevator the previous day. (See id.). The trial court then
19   called the remainder of the jury into the courtroom, as well as the alternate jurors, and re-
20   admonished all of them to walk away from and report to the court, any overheard conversations
21   about the case. (See id. at 281-82). The trial court asked the jurors and alternates whether they
22   had overheard any conversations in the hallway or elevator the previous day or any other day.
23   (Id. at 282). No juror indicated that he or she had overheard any conversations and the trial court
24   moved on to other matters, implicitly determining that there was no factual predicate for a claim
25   of potential juror impartiality. (See id.); see also Burks v. Borg, 27 F.3d 1424, 1432 (9th Cir. 1994),

27   [4] "Evidence not presented at trial, acquired through out-of-court experiments or otherwise, is
28   deemed 'extrinsic.'" United States v. Navarro-Garcia, 926 F.2d 818, 821 (9th Cir. 1991); Marino
     v. Vasquez, 812 F.2d 499, 504-05 (9th Cir. 1987).

6

1  cert. denied, 513 U.S. 1095 (1995) & 513 U.S. 1160 (1995) ("'[T]he extent, if at all, to which the
2  jurors saw or discussed the extrinsic evidence,' is a question of historical fact as to which the state
3  court's findings are entitled to a presumption of correctness.")[5] (citation omitted).

4       Given the trial court's investigation and admonishment, petitioner has not shown that the
5  alleged elevator conversation exposed any juror to extrinsic evidence.  Similarly, when defense
6  counsel brought to the trial court's attention that the jurors might have overheard a negative
7  opinion about the victim allegedly expressed by an "apparent[] court watcher[]" while the jurors
8  were in the hallway, the trial court immediately questioned the jurors about this incident and
9  determined that nobody had been exposed to this extrinsic opinion. (See RT at 859-60). In short,
10 petitioner's allegations of juror misconduct based on events brought to the attention of the trial
11 court are without merit.  See United States v. Tarpley, 945 F.2d 806, 811 (5th Cir. 1991), cert.
12 denied, 504 U.S. 917 (1992) (district court properly investigated alleged juror misconduct and
13 defendant's right to an impartial jury was not violated where district court held a hearing and
14 determined that no extrinsic evidence reached the jury); Burks, 27 F.3d at 1432 n. 6 (Since "no
15 prejudicial information was actually introduced, . . . there was no constitutional error."); United
16 States v. Snype, 441 F.3d 119, 137 (2d Cir.), cert. denied, 549 U.S. 923 (2006) (rejecting
17 constitutional challenge due to jury's alleged exposure to extrinsic information where no such
18 exposure occurred); United States v. Vigil, 281 F.App'x 730, 731 (9th Cir.), cert. denied, 555 U.S.
19 960 (2008) (unpublished disposition) (affirming denial of new trial motion due to jury's alleged
20 exposure to extrinsic evidence "[b]ecause no extrinsic evidence was presented to the jury in the
21 first instance").

22      Petitioner also submitted three declarations that she claims are sufficient to warrant an
23 evidentiary hearing. (See Petitioner's Objections at 8).  First, petitioner submitted a declaration

24

25     [5] This is true even if, as here, the claim is reviewed de novo. See Matthews v. Ishee, 486 F.3d
26 883, 891-92 (6th Cir.), cert. denied, 552 U.S. 1023 (2007) (reviewing claim de novo but applying
27 presumption of correctness to state court's factual findings); McCaskill v. Budge, 2012 WL
   4963859, at *17 (D. Nev. 2012) (State courts' factual determinations "are entitled to a presumption
28 of correctness on federal habeas review, even on de novo review otherwise as to the law.") (italics
   in original).

1  signed on July 30, 1997, by her sister, Darlene Bausch ("Bausch"), that attempts to recharacterize
2  the events surrounding the elevator incident. (See Motion, Exh. J at 301-02; Supp. Reply at Exh.
3  B). In particular, Bausch alleged that before trial, but after the jurors were chosen, she was in a
4  courthouse elevator "when three of the jurors entered the elevator" and a juror she believed to be
5  "juror Hogan" said to the other two unidentified jurors, "'I just want to get this over with we all know
6  she's guilty, she even looks guilty.'" (Motion, Exh. J at 301-02 (emphasis omitted); see Supp.
7  Reply at Exh. B). Bausch stated that "[t]he other two jurors nodded their heads and made some
8  comments to the effect that they agreed with the first juror." (Motion, Exh. J at 302). Bausch
9  claims that she notified petitioner's counsel before returning to the courtroom, that the trial judge
10 then questioned "the juror," and the juror "denied making any statement." (Id.).

11 Petitioner also submitted a 1997 declaration from her mother, Edythe Bausch, stating that
12 "[a]t one particular time" outside the courtroom, "my family, the jurors and spectators were
13 scattered in the hall" when she "overheard one of the jurors talking about an incident that
14 happened the night before when he was at a Taco Bell restaurant" and "one of the male jurors
15 sa[id] 'maybe one of those murderers in there did it' while pointing his finger towards the
16 courtroom" while "[t]he group of jurors laughed and chuckled." (Motion, Exh. J at 320-21). Finally,
17 petitioner provided her own declaration, signed April 1, 1997, in which she stated as follows:

18               [M]y family directly overheard several people, one of them juror
19        Hogan, talking about a high profile burglary that had recently occurred in the
20        Canoga Park area and specifically relating it to my trial. My family heard the
21        juror(s) saying to each other that this burglary in Canoga Park was probably
22        committed by me and my accomplices and that I must be guilty. At my trial
23        the judge questioned the jurors on at least two occasions warning them that
24        they are not to discuss the case outside of the jury room. [¶] . . . My
25        attorney's [sic] at trial, Darrel Shirow and Tom Stanley, told me that they
26        heard the jurors speaking about my case in the cafeteria. Specifically, [they]
27        told me that they heard, "we (the jurors) know who the murder[er] is, why is
28        there even a trial?" [¶] . . . My sister, Daclene Ciccone, told me that she

8

1            heard a juror say, "she looks guilty." [¶] . . . My mother, Edythe Bausch, and

2            Arthur Tapia, told me that they heard jurors in the elevator, including juror

3            Hogan, say "This is in regards to the Canoga Park Taco [B]ell [r]obbery" and

4            that the jurors were having a discussion about the Taco Bell robbery making

5            allusions to my trial and said "it was probably me and those murder[er]s in

6            there (the courtroom)."

7 (Motion, Exh. J at 324).

8        Petitioner's contention that these declarations warrant an evidentiary hearing, (see

9 Petitioner's Objections at 8), is unpersuasive. First, petitioner's self-serving hearsay declaration

10 is manifestly insufficient to support her claim for habeas relief. See Dows v. Wood, 211 F.3d 480,

11 486-87 (9th Cir.), cert. denied, 531 U.S. 908 (2000) (habeas petitioner's self-serving affidavit was

12 insufficient evidence to establish factual basis for claim); Snyder v. Grayson, 872 F.Supp. 416,

13 420 (E.D. Mich. 1994), affirmed by, 57 F.3d 1070 (6th Cir.) (unpublished disposition), cert. denied,

14 516 U.S. 889 (1995) ("[I]t is well-established that a self-serving habeas affidavit is not sufficient

15 to establish a constitutional violation."). Second, the declarations of petitioner and her mother are

16 inconsistent in their allegations regarding the jurors' alleged "Taco Bell" statements. (Compare

17 Motion, Exh. J at 320-21 with id. at 324). Third, Bausch's characterization of the events

18 surrounding the elevator incident is belied by the record. (See RT at 277-82). Indeed, the record

19 reveals that petitioner's family reported potential juror issues to defense counsel and those

20 attorneys were diligent in raising the issues before the trial court. (See id. at 277-82 & 859-60).

21 Thus, it defies logic and common sense to suggest that if petitioner's sister and mother had truly

22 heard jurors speaking in the manner set forth in the declarations, such statements would not have

23 been promptly raised in front of the trial court. Defense counsel had assiduously raised the far

24 less egregious juror concerns that petitioner's family brought to their attention. (See id.) The

25 declarations were all made over five years after petitioner's conviction in declarations submitted

26 by Dangler, an attorney who resigned from the bar because of professional misconduct. In short,

27 the declarations of petitioner, her mother and her sister do not warrant either habeas relief or an

28 evidentiary hearing. See Schriro v. Landrigan, 550 U.S. 465, 474, 127 S.Ct. 1933, 1940 (2007)

Help

1    Petitioner again raised the issue in a motion for a new trial, arguing that the trial court's
2    refusal to appoint Dr. McAdoo deprived petitioner of the right to present evidence on her behalf.
3    The trial court denied petitioner's motion. (See Clerk's Transcript ("CT") at 808-11; RT at 1298-
4    1304).

5    B.    Applicable Federal Law.

6        "The Sixth Amendment guarantees criminal defendants the effective assistance of
7    counsel." Yarborough v. Gentry, 540 U.S. 1, 4, 124 S.Ct. 1, 4 (2003) (per curiam). To succeed
8    on an ineffective assistance of trial counsel claim, a habeas petitioner must demonstrate both that
9    counsel's performance was deficient and that the deficient performance prejudiced the defense.
10   Premo v. Moore (Moore), 131 S.Ct. 733, 739 (2011); Strickland v. Washington, 466 U.S. 668, 687,
11   104 S.Ct. 2052, 2064 (1984). The petitioner bears the burden of establishing both components.
12   Williams, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 1511-12; Smith v. Robbins (Robbins), 528 U.S.
13   259, 285-86, 120 S.Ct. 746, 764 (2000); Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. "'To
14   establish deficient performance, a person challenging a conviction must show that 'counsel's
15   representation fell below an objective standard of reasonableness.'" Harrington v. Richter
16   (Richter), 131 S.Ct. 770, 787 (2011) (citation omitted); Moore, 131 S.Ct. at 739.   Prejudice
17   "focuses on the question whether counsel's deficient performance renders the results of the trial
18   unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell (Fretwell), 506 U.S. 364,
19   372, 113 S.Ct. 838, 844 (1993); Williams v. Taylor, 529 U.S. at 393 n. 17, 120 S.Ct. at 1513 n.
20   17 (2000).

21       To establish deficient performance, the petitioner must show her counsel "made errors so
22   serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth
23   Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. at 2064; Williams, 529 U.S. at 391, 120 S.Ct.
24   at 1511. In reviewing trial counsel's performance, the court will "strongly presume[] [that counsel]
25   rendered adequate assistance and made all significant decisions in the exercise of reasonable
26   professional judgment." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066; Cullen v. Pinholster
27   (Pinholster), 131 S.Ct. 1388, 1403 (2011). Only if counsel's acts or omissions, examined within
28   the context of all the surrounding circumstances, were outside the "wide range" of professionally

1  competent assistance, will the petitioner meet this initial burden. <u>Kimmelman v. Morrison</u>, 477
2  U.S. 365, 386, 106 S.Ct. 2574, 2588 (1986).

3          If the petitioner makes this showing, she must then establish there is a "reasonable
4  probability that, but for counsel's unprofessional errors, the result of the proceeding would have
5  been different." <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. at 2068; <u>Pinholster</u>, 131 S.Ct. at 1403.
6  The errors must not merely undermine confidence in the outcome of the trial, but must result in
7  a fundamentally unfair proceeding, <u>Williams</u>, 529 U.S. at 393 n. 17, 120 S.Ct. at 1513 n. 17;
8  <u>Fretwell</u>, 506 U.S. at 369, 113 S.Ct. at 842-43, and "[t]he likelihood of a different result must be
9  substantial, not just conceivable." <u>Richter</u>, 131 S.Ct. 770, 792 (2011); <u>Pinholster</u>, 131 S.Ct. at
10  1403. However, a court need not determine whether counsel's performance was deficient before
11  examining the prejudice the alleged deficiencies caused the defendant. <u>See</u> <u>Robbins</u>, 528 U.S.
12  at 286 n. 14, 120 S.Ct. at 764 n. 14 ("'If it is easier to dispose of an ineffectiveness claim on the
13  ground of lack of sufficient prejudice, . . . that course should be followed'") (quoting <u>Strickland</u>, 466
14  U.S. at 697, 104 S.Ct. at 2069).

15          C.      <u>Analysis</u>.

16          Petitioner contends counsel was ineffective in not timely seeking Dr. McAdoo's
17  appointment to examine Meyer to determine if she suffered from BWS and, if she did, testify for
18  the defense to bolster Meyer's testimony by explaining Meyer's actions in relation to BWS.
19  Petitioner's contentions are without merit since petitioner has not presented a declaration from
20  Dr. McAdoo establishing that Dr. McAdoo was available to testify and what his testimony would
21  have been.[7] <u>See</u> <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1088 (9th Cir. 2001), <u>amended by</u>, 253 F.3d
22  1150 (9th Cir. 2001) (mere speculation that witness might have given helpful information is not
23  enough to establish ineffective assistance); <u>Dows</u>, 211 F.3d at 486 (rejecting claim of ineffective
24  assistance based upon lack of affidavit from witness regarding substance of testimony); <u>Morris</u>
25  <u>v. State of California</u>, 966 F.2d 448, 455-56 (9th Cir.), <u>cert. denied</u>, 506 U.S. 831 (1992)
26  ("[W]ishful suggestions" as to what a witness might say "cannot substitute for declaratory or other

27  _____

28          [7] Nor has petitioner presented a declaration from any other BWS expert, and there is no
evidence that Meyer has ever been diagnosed with BWS.

1    evidence."). Indeed, petitioner merely speculates that Dr. McAdoo, after examining Meyer, would

2    have determined that Meyer suffered from BWS and offered the opinion that Meyer's actions were

3    affected by BWS. However, mere speculation about what an expert could have testified to is not

4    enough to "affirmatively prove prejudice." Strickland, 466 U.S. at 693, 104 S.Ct. at 2067; see

5    Bible v. Ryan, 571 F.3d 860, 871 (9th Cir. 2009), cert. denied, 130 S.Ct. 1745 (2010) ("Bible's

6    argument . . . relies on speculation that . . . is not sufficient to establish prejudice."); Gonzalez v.

7    Knowles, 515 F.3d 1006, 1016 (9th Cir. 2008) ("Such speculation is plainly insufficient to establish

8    prejudice."); Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001) (speculation that an expert

9    would have testified on petitioner's behalf at trial "is insufficient to establish prejudice[]" for

10    ineffective assistance of counsel claim); Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997)

11    ("Speculation about what an expert could have said is not enough to establish prejudice.").

12    Finally, the trial court denied the expert request not only because it was untimely, but also

13    because of its irrelevance and the undue consumption of time and confusion of issues the

14    presentation of such testimony would have entailed. (See RT at 975-78). Thus, petitioner cannot

15    establish counsel's failure to timely request an expert prejudiced her since the trial court indicated

16    that it would have denied petitioner's request on relevance and other grounds even if timely made.

17    (See id.). In short, petitioner's ineffective assistance of counsel claim is without merit.

18    III.    VINDICTIVE PROSECUTION.

19    In Ground Six, petitioner contends she was denied due process of law and a fair trial by

20    prosecutorial vindictiveness.    (Petition at 6A).    In particular, petitioner contends that the

21    prosecution acted vindictively in charging her with special circumstances murder after she

22    successfully set aside her earlier guilty plea for second degree murder. (Id.).

23    A prosecutor violates due process when he seeks additional charges solely to punish a

24    defendant for exercising a constitutional or statutory right. Bordenkircher v. Hayes, 434 U.S. 357,

25    363, 98 S.Ct. 663, 668 (1978); United States v. Kent, 649 F.3d 906, 912 (9th Cir.), cert. denied,

26    132 S.Ct. 355 (2011). Such vindictive prosecution may be established by direct evidence of an

27    expressed hostility or threat to petitioner for having exercised a constitutional right. United States

28    v. Goodwin, 457 U.S. 368, 380-81, 102 S.Ct. 2485, 2492 (1982); United States v. Gallegos-Curiel,

681 F.2d 1164, 1168 (9th Cir. 1982).   Absent direct evidence of actual vindictiveness, a presumption of vindictiveness may arise if petitioner "provides '[e]vidence indicating a realistic or reasonable likelihood of vindictiveness[.]'" Nunes v. Ramirez-Palmer, 485 F.3d 432, 441-42 (9th Cir.), cert. denied, 516 U.S. 814 (1995); United States v. Montoya, 45 F.3d 1286, 1299 (9th Cir.), cert. denied, 550 U.S. 814 (1995).  The prosecution then has the burden to show a non-vindictive reason for bringing the charges.  Nunes, 485 F.3d at 442; Montoya, 45 F.3d at 1299.

Here, since petitioner has not set any direct evidence establishing that the prosecutor acted with actual vindictiveness, (see Petition at 6A-6B; Reply at 34-36; Petitioner's Objections at 15-19), petitioner's "conviction in this case may be reversed only if a *presumption* of vindictiveness . . . is warranted."  Goodwin, 457 U.S. at 380-81, 102 S.Ct. at 2492 (italics in original); United States v. Van Doren, 182 F.3d 1077, 1082 (9th Cir. 1999).  Petitioner has not shown that such a presumption is applicable.

The California Court of Appeal made the following factual findings[8] regarding the charges against petitioner:

> On June 14, 1984, a felony complaint was filed, charging [petitioner], Meyer and Peters with first degree murder, first degree burglary and robbery, with a felony murder special circumstance allegation. [Petitioner] and Meyer quickly struck a deal with the prosecutor and both women waived their right to a preliminary hearing. On November 9, as part of the bargain, [petitioner] testified against Peters at his preliminary hearing. . . . On November 16, an information was filed charging [petitioner] and Meyer with Levy's murder (but not the burglary or robbery or special circumstance allegation) and, the same day, [petitioner] pled guilty to second degree murder. . . . On December 21,

---

[8] Although this claim is reviewed de novo, the California Court of Appeal's opinion "provides useful guidance." McNeiece v. Lattimore, 2009 WL 1464368, at *14 n. 8 (C.D. Cal. 2009), affirmed by, 2012 WL 6757956 (9th Cir. 2012) (unpublished disposition).  In addition, although these factual findings are set forth in Part V of the Amended Report and Recommendation, the Court repeats them here as they are pertinent to the Court's evaluation of petitioner's vindictive prosecution claim.

1   [petitioner] was sentenced to state prison pursuant to the agreement, for a

2   term of 15 years to life, with a promise of parole in seven and one-half years.

3   [Petitioner] began serving her sentence. In early 1989, however,

4   [petitioner] filed in the trial court a petition for a writ of habeas corpus,

5   contending she had not been advised that, following her release from prison

6   after serving her seven and one-half year term, she would be on parole for

7   the rest of her life (Pen. Code, § 3000.1) and demanding that her guilty plea

8   be set aside. On October 13, 1989, following a hearing, [petitioner's] motion

9   was granted and her plea was set aside. Since a preliminary hearing had

10  been waived as part of the [original] plea agreement [in 1984], the matter

11  was sent back to the municipal court and started anew and, in December

12  1990, [petitioner] was charged by an amended information with Levy's felony

13  murder, which she was alleged to have aided and abetted during the

14  commission of a residential burglary, and with residential burglary.

15  (Motion, Exh. A ("Opinion") at 7-8); (see also CT at 412-21; Reporter's Transcript, Nov. 16, 1984

16  ("Nov84RT") at 1-7; Reporter's Transcript, Dec. 21, 1984 ("Dec84RT") at 1-5). The California

17  Court of Appeal subsequently concluded:

18  Since counts dismissed as part of a plea bargain are revived when a

19  guilty plea is set aside, it follows necessarily that an offense (the burglary)

20  and an enhancement allegation (felony murder) which were not charged in

21  the first information because of the plea bargain (but were charged in the

22  felony complaint filed in municipal court) may be charged when the guilty

23  plea is set aside. But for [petitioner's] plea agreement, it is clear that the

24  burglary charge and the felony murder allegation would have been included

25  in the information filed in 1984 and they were therefore properly included in

26  the amended information filed in 1990.

27  (Opinion at 10-11) (citation omitted); (see also CT at 415-18).

28

1    In <u>Taylor v. Kincheloe</u>, 920 F.2d 599 (9th Cir. 1990), Taylor, who was charged with two
2    counts of first degree murder and one count of arson, entered into a plea agreement in which the
3    prosecutor lowered one of the first degree murder counts to second degree murder and dropped
4    the arson count, and Taylor was sentenced to two concurrent life terms. <u>Id.</u> at 601. "Several
5    months later, however, Taylor convinced the state court of appeals to vacate the entire plea
6    agreement on the ground he had not understood its consequences." <u>Id.</u> "The prosecutor
7    responded by reinstating the original pre-plea indictment, and Taylor was tried again in January
8    1977. This time the jury convicted him of two counts of first-degree murder, and acquitted him
9    of the arson charge. The judge who presided over the second trial sentenced Taylor to two
10   *consecutive* life terms." <u>Id.</u> (italics in original). Based on these circumstances, the Ninth Circuit
11   rejected Taylor's claim that reinstatement of the original indictment, after Taylor had had his plea
12   set aside, raises a presumption of prosecutorial vindictiveness, holding that "when a plea
13   agreement is vacated, no presumption of vindictiveness arises when the prosecutor simply
14   reinstates the indictment that was in effect before the plea agreement was entered." <u>Id.</u> at 606.

15       Here, petitioner was initially charged with special circumstances murder, pled guilty to
16   second degree murder and, after petitioner's guilty plea was set aside at her request and a new
17   trial ordered, petitioner was again charged with special circumstances murder.[9] (<u>See</u> CT at 416-
18   18 & 510; Nov84RT at 2-7). As in <u>Taylor</u>, petitioner was returned to the position she was in before
19   she accepted the plea bargain. Thus, petitioner has not established any presumption of
20   prosecutorial vindictiveness, and her claim is without merit.[10]  <u>See</u> <u>Taylor</u>, 920 F.2d at 606;

21

22   [9] On November 16, 1984, at the time petitioner pled guilty, an information was filed charging
23   petitioner and Meyer with murder. (CT at 415). However, as this information was entered in
     conjunction with the plea bargain, (<u>see</u> Opinion at 10-11; Dec84RT at 2), the Court looks to the
24   charges initially filed against petitioner to determine whether a presumption of vindictiveness
     applies.
25

26   [10] In her Objections, petitioner relies on <u>Adamson v. Ricketts</u>, 865 F.2d 1011 (9th Cir. 1988)
     (<u>en</u> <u>banc</u>), <u>cert. denied</u>, 497 U.S. 1031 (1990), <u>abrogated on other grounds</u>, <u>Walton v. Arizona</u>,
27   497 U.S. 639, 110 S.Ct. 3047 (1990), to support her vindictive prosecution claim. (<u>See</u>
     Petitioner's Objections at 15-19). Adamson was charged with first degree murder, but entered
28   into a plea agreement in which he pled guilty to second degree murder and agreed to testify
     against the two individuals – Dunlap and Robison – who allegedly hired him to commit the murder.

1 | Santobello, 404 U.S. at 263 n. 2, 92 S.Ct. at 499 n. 2 ("If the state court decides to allow
2 | withdrawal of the plea, the petitioner will, of course, plead anew to the original charge on two
3 | felony counts."); United States v. Barker, 681 F.2d 589, 593 (9th Cir. 1982) ("Returning Barker to
4 | the position she was in before she asserted, and then withdrew, her guilty plea did not enhance
5 | her risk of punishment and thus did not imply any retaliatory intent."); United States ex rel.
6 | Williams v. McMann, 436 F.2d 103, 106 (2d Cir. 1970), cert. denied, 402 U.S. 914 (1971) ("When
7 | Williams was successful in revoking his part of the bargain by having his plea of guilty set aside,
8 | it is hardly surprising, and scarcely suggestive of vindictiveness, that the district attorney in turn
9 | withdrew his consent to the reduced charge."); United States v. Anderson, 514 F.2d 583, 588 (7th
10 | Cir. 1975) ("There is no appearance of retaliation when a defendant is placed in the same position
11 | he was in before he accepted the plea bargain.").

12 |       Petitioner's remaining objections are without merit and do not warrant further comment.[11]

13 |
_____

14 | Adamson, 865 F.2d at 1014. Adamson testified against Dunlap and Robison, who were each
15 | convicted of conspiracy and first degree murder. But the Arizona Supreme Court subsequently
16 | overturned their convictions. Id. Although the State sought to have Adamson testify at the retrials
     of Dunlap and Robison, Adamson contended that his obligations under the plea bargain had
     ended and sought further consideration, including release, in return for his testimony. Id. The
17 | State subsequently called Adamson as a witness at pretrial proceedings in the Dunlap and
     Robison retrials, and Adamson confirmed his previous testimony, but asserted a Fifth Amendment
18 | privilege when asked about another crime. Id. at 1015. In response, the State filed a new
19 | information charging Adamson with first degree murder and seeking the death penalty. Id.
     Adamson challenged the new information in the Arizona Supreme Court, which held that by
20 | refusing to testify, Adamson had breached the plea agreement. Id. The Arizona Supreme Court
     then vacated Adamson's guilty plea and reinstated the open murder charge, and Adamson was
21 | subsequently convicted of first degree murder and sentenced to death. Id. at 1015-16. In this
     situation, the Ninth Circuit found that "[t]he circumstances surrounding the State's decision to seek
22 | the death penalty for Adamson clearly reflect the real likelihood of actual vindictiveness and thus
23 | give rise to a presumption of vindictiveness." Id. at 1018. However, as the Taylor court
     concluded, Adamson does not support a presumption of vindictiveness in situations such as
24 | petitioner's – and the petitioner in Taylor – in which the defendant successfully sought to vacate
     a guilty plea and the prosecution subsequently reinstated the original charges against the
25 | defendant. See Taylor, 920 F.2d at 606 n. 10. Thus, Adamson is inapposite, and the court
26 | applies Taylor and the related cases cited herein to reject petitioner's claim.

27 |      [11] Petitioner correctly notes in her Objections that although the jury was instructed with CALJIC
     3.02, the trial court later withdrew the instruction. (See RT at 1279; Petitioner's Objections at 21-
28 | 22; Amended Report and Recommendation at 44 n. 33). However, this does not affect the
     resolution of any of petitioner's claims.

1

## CONCLUSION

2    Under 28 U.S.C. § 636, the Court has reviewed the Petition, all of the records herein, the

3  Magistrate Judge's Amended Report and Recommendation, and Petitioner's Objections. Having

4  made a de novo determination of the portions of the Amended Report and Recommendation to

5  which petitioner's Objections were directed, the Court concurs with and accepts the findings and

6  conclusions of the Magistrate Judge.  Accordingly, IT IS ORDERED THAT:

7    1.    Judgment shall be entered dismissing the action with prejudice.

8    2.    The Clerk shall serve copies of this Order and the Judgment herein on the parties.

9  DATED: AUGUST  31            , 2013.

10

11                                      ANDREW J. GUILFORD
                                        UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28